**Opinion issued December 16, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NOS. 01-13-00408-CR**
**01-13-00409-CR**
**01-13-00410-CR**
**01-13-00411-CR**

———————————

**WYDELL DIXON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 56th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 12-CR-0748, 12-CR-0749, 12-CR-0750, 12-CR-0751**

---

**O P I N I O N**

A jury convicted appellant, Wydell Dixon, of four charges of cruelty to

nonlivestock animals, a state jail felony. *See* TEX. PENAL CODE ANN. § 42.092(b)(1),

(c) (Vernon 2011). The trial court then assessed punishment at two years' confinement, but suspended, and placed appellant under community supervision for five years' on each charge, to be served concurrently. On appeal, appellant contends (1) the evidence, when measured under a hypothetically correct jury charge, was legally insufficient; the trial court erred by (2) overruling appellant's motion to dismiss because the indictments charged a misdemeanor, not a felony; (3) permitting the State to charge strict liability offenses; (4) denying appellant's motion to quash based on the doctrine of *in pari materia*; (5) failing to submit appellant's requested defensive charges; (6) permitting behavior by the State that deprived appellant of due process and due course of law; and (7) failing to grant a mistrial and denying appellant's motion for new trial after jurors were not provided overnight facilities and were allowed to separate. We affirm.

## BACKGROUND

Appellant, Wydell Dixon, was the owner of a non-profit cat sanctuary located at 1112 6th Street in Texas City, Texas. The sanctuary, known as "Whiskerville," had been in operation since approximately 2003. At a cat sanctuary, as opposed to a shelter, the cats are not euthanized or killed. The cats are free to live there until they pass from old age. The cats at Whiskerville were "free range" and were not kept in cages. The majority of the Whiskerville cats were older cats and, therefore, not adoptable.

2

At the time of the offense, Whiskerville had only one employee, Kimberly Paskert. Paskert started working at Whiskerville in 2005, but left for a year in October or November of 2009, when she and appellant had a dispute over Paskert's work. Paskert was paid $30 per day when she started, and she was sometimes allowed to use a gas card for extra work.

Paskert returned to Whiskerville in October 2010 and worked there until December 2011. She worked five days per week until a part-time employee left in early February 2011. From the end of January or beginning of February 2011, until December 26, 2011, Paskert worked seven days per week. Paskert took off only three days in 11 months—one day each in October, November, and December 2011.

As the sole employee caring for nearly 200 cats, Paskert's work at Whiskerville was, as described by another former employee, "back breaking." Paskert's daily tasks included: cleaning the messes the cats made on the floors and counters; emptying four big litter pans, then scraping and cleaning the litter pans with sponges and sanitizer; refilling the litter pans; sweeping and cleaning the locations for the litter pans and putting the pans back; carrying 40 pound bags of litter from the garage into the main building, two to three times per day; cleaning inside the two feeders, if necessary, and refilling them; carrying 25 pound bags of food from the garage into the main building, at least twice per day; refilling the cat

3

food bins inside the main building, usually twice per day; cleaning the outside, the bottom, and, if necessary, the inside, of the 2.7 and 5 gallon water containers and then refilling them; and cleaning the bed, rug, litter pan, food container, and water container in as many as five cages.

Paskert had to do all this for the main area, the hallway, each of the six rooms in the main building, and the back building. Paskert had to clean furniture and take the trash out of every room. It took seven trips per day just to carry the used cat litter to the dumpster. Paskert's weekly tasks included: taking apart and cleaning the feeders; brushing the laundry, rugs, and towels, before taking them to Dixon to be washed at least three times per week; mopping once or twice per week; and cleaning all the windows. Paskert also had additional tasks to perform as needed: administering medicines and special foods to sick cats, sometimes feeding them with a syringe; cleaning the cat trees, which were as high as seven feet; soaking and rinsing the cat toys; clipping the cats' claws, so they would not grow into their paws; and checking the cats' ears for mites.

It took Paskert 10 to 15 hours per day, depending on messes, to do all of the daily chores, when she was able to finish them. Paskert always tried her hardest, but she "couldn't keep up with it all." She tried to do all she possibly could two to three days per week. Some days she worked six to eight hours; the minimum was three to five hours.

On January 3, 2012, animal control officers and peace officers responded to a complaint about Whiskerville. Kim Schoolcraft, the Animal Services Manager for the Galveston County Health District, looked through the windows. She saw dead animals, feces and urine on the floor and walls, and large feeders and water containers that were empty and dumped over. A lot of live cats were roaming freely. The cats had their mouths open, a sign of distress. There was a very strong odor, "[e]ven outside the building." Schoolcraft and the others waited until Texas City Police Department officers arrived to assess the situation and then obtain a civil animal seizure warrant.

Corporal Grandstaff, the Animal Control Supervisor of the Texas City Police Department, arrived. When Grandstaff looked through the windows, he saw dead cats. He also saw live cats clawing at the window and "screaming," "like they wanted to get out." Grandstaff testified there was "filth everywhere," feces all over, and water bowls overturned. He saw cats in cages without water bowls or food, and he smelled a stench.

Eventually, officers obtained a civil animal seizure warrant to rescue the cats in distress. When officers forced open a door, the stench was overwhelming. One animal control officer entered but had to exit, and vomited. Schoolcraft and Grandstaff entered, but had to back out because the odor was overwhelming. The

air inside Whiskerville was so bad officers had to obtain respirators for people to go inside and rescue the cats.

Once equipped with a respirator, Schoolcraft entered and saw several dead cats. Feces and urine covered the floor, the walls, and even the windows—"just about every surface." Live cats were running everywhere, terrified. There was no water available to the cats when officers entered the building. When officers poured water into bowls the cats fought and climbed over each other, "yowling, desperate for the water."

Schoolcraft testified that every cat was matted with urine and feces. This is unusual because cats are clean animals and it means the cats had given up trying to clean themselves. Many of the cats were emaciated, but some were very obese. There was evidence that some cats had cannibalized dead cats. Schoolcraft concluded that some of the cats had taken over the sources of food and water and not allowed the other cats near them.

Schoolcraft testified almost all of the cats had "upper respiratory infection, mouth ulcers, parasites, ear mites, ringworms, all types of problems." Many had green discharge from their nose and eyes. Some of the cats had open wounds. None of the cats were healthy.

Schoolcraft said there were five cages with cats inside that had no food or water. The rest of the cats were roaming freely, though some were in rooms with

6

the doors shut. There was at least one dead cat in each room. Twenty-seven dead cats and 168 live cats—a total of 195 cats—were removed from Whiskerville.

Both appellant and Paskert arrived at Whiskerville during the process of the cat seizures. Upon arrival, appellant asked about what was going on. When informed about the conditions inside Whiskerville, appellant became very upset and said, "I don't know why I pay her." Paskert was interviewed on television and indicated that she wanted to kill herself for her failure to take care of the cats.

During a subsequent interview with police, Paskert claimed that she had arranged to have a volunteer named Karen Tibbets take care of the cats so that she, Paskert, could take a week off after Christmas. Paskert said that she thought Tibbets was taking care of the cats. Paskert also said that she did not tell appellant about subcontracting her work to Tibbets, and that twice she told appellant that the "kitties were fine." Police were unable to locate anyone in the area named Karen Tibbets and concluded that no such person existed.

Appellant and Paskert were both arrested and charged with cruelty to nonlivestock animals. Paskert testified at appellant's trial under an offer of use immunity. She was not offered a plea deal in her own case.

After the case was submitted to the jury, appellant moved to sequester the jurors, and the trial court granted her motion. The jurors were taken to a local hotel at approximately 11 p.m. after the first day of deliberations. Approximately

7

four hours later, a bomb threat was phoned in to their hotel. The bailiffs evacuated the jurors, who were kept together, but who overheard third parties talking about the bomb threat. After the bailiffs were unable to find other accommodations for the jurors, they returned the jurors to the deliberation room at the courthouse, where the jurors slept on the floor the rest of the night. After continuing their deliberations the next morning, the jury returned guilty verdicts on four counts of animal cruelty.

## INDICTMENT ISSUES

In her first issue on appeal, appellant contends the evidence was legally insufficient to support her convictions. Appellant argues that, under a hypothetically correct jury charge, she "would necessarily have been charged either for abandoning the animals or unreasonably failing to provide necessary food, water, or care[,]" and that she was instead "charged with killing the animals based upon elements defined as a misdemeanor in the statute." In her second issue on appeal, appellant contends that "the trial court err[ed] by overruling [her] motion to dismiss the indictments where the State alleged a felony by commission of elements defined as a misdemeanor under the animal cruelty statute[.]" Both issues hinge, at least in part, on appellant's argument that failing to feed the animals is a misdemeanor under the animal cruelty statute and that "[t]he State may not allege a misdemeanor cruelty charge under the guise of a felony."

8

*Jurisdiction*

Because appellant's second issue on appeal challenges the jurisdiction of the trial court, we address it first. Whether a court has subject matter jurisdiction is a question of law. *Coleman v. State*, No. 07–10–00423–CR, 2011 WL 3925767, at *2 (Tex. App.—Amarillo Sept. 7, 2011, no pet.) (mem. op., not designated for publication) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)). In Texas, district courts have jurisdiction over felony offenses. TEX. CODE CRIM. PROC. ANN. art. 4.05 (Vernon 2005); *see also* TEX. CONST. art. V, § 8 ("District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body."); TEX. GOV'T CODE ANN. § 24.007(a) (Vernon Supp. 2014) ("The district court has the jurisdiction provided by Article V, Section 8, of the Texas Constitution."); *Puente v. State*, 71 S.W.3d 340, 343 (Tex. Crim. App. 2002) ("A district court has jurisdiction over felony offenses. It does not have original jurisdiction over misdemeanor charges, except those involving official misconduct.").

Appellant, relying on *State v. Kingsbury*, 129 S.W.3d 202, 206–07 (Tex. App.—Corpus Christi 2004, no pet.), argues that "[a] person can commit the misdemeanor offense of failing unreasonably to provide necessary food, water,

9

care or shelter or a person may commit the felony offense of torturing, killing, or causing serious bodily injury to an animal—but a person cannot commit a felony offense by committing predicate acts that are listed as a misdemeanor under the statute." The State responds that *Kingsbury* is not applicable because it interprets a version of the animal cruelty act that has since been amended. We agree with the State.

In *Kingsbury*, the State indicted Kingsbury for felony animal cruelty. *Id.* at 204. The animal cruelty statute in effect at the time provided that:

(a) A person commits an offense if the person intentionally or knowing:

(1) tortures an animal;

(2) fails unreasonably to provide necessary food, care, or shelter for an animal in the person's custody; . . . or

(5) kills, seriously injures, or administers poison to an animal, other than cattle, horses, sheep, swine, or goats, belonging to another without legal authority or the owner's effective consent . . . .

Acts of 1989, 71st Leg., ch. 1253, § 2, eff. Sept. 1, 1989; Acts of 1993, 73rd Leg., ch. 900, § 1.01, eff. Sept. 1, 1993; Acts of 1995, 74th Leg., ch. 318, § 18, eff. Sept. 1, 1995; Acts of 1997, 75th Leg., ch. 1281, § 2, eff. Sept. 1, 1997; Acts of 2001, 77th Leg., ch. 450, § 1, eff. Sept. 1, 2001; Acts of 2003, 78th Leg., ch. 1275, § 2(11), eff. Sept. 1, 2003; Acts of 2007, 80th Leg., ch. 886, § 1, eff. Sept. 1, 2007 (current version at TEX. PENAL CODE ANN. § 42.092 (Vernon 2011). Under the prior statute, torturing an animal under subsection (a)(1) and killing, seriously

injuring, or poisoning another person's animal under subsection (a)(5) were felonies, while failing to provide necessary food, care, or shelter to an animal in one's custody under subsection (a)(2) was a misdemeanor. *Id.* The statute did not define "tortures." *Id.*

The felony indictment against Kingsbury alleged that he intentionally or knowingly tortured four dogs by leaving them without food and water, which led to their deaths. *Kingsbury*, 129 S.W.3d at 204. Kingsbury filed a motion to dismiss, alleging that the indictment alleged felony torture, but used, as the defining element, language from the misdemeanor offense of failing to provide necessary food, care, or shelter. *Id.* The trial court agreed, and dismissed the case for want of jurisdiction because the indictment alleged a misdemeanor under the guise of a felony. *Id.* The court of appeals affirmed, holding that "torture" could not be interpreted to include the misdemeanor criminal acts of failing to provide necessary food, care, or shelter. *Id.* at 206. To permit such an overbroad meaning of "torture" would allow any of the misdemeanor acts of cruelty to be charged as felonies. *Id.* at 207.

However, the animal cruelty statute was amended in 2007, and the current version provides in part as follows:

> (b) A person commits an offense if the person intentionally, knowingly, or recklessly:

11

(1) Tortures an animal or in a cruel manner kills or causes serious bodily injury to an animal;

(2) Without the owner's effective consent, kills, administers poison to, or causes serious bodily injury to an animal;

(3) fails unreasonably to provide necessary food, water, care, or shelter for an animal in the person's custody;

(4) abandons unreasonably an animal in the person's custody;

(5) transports or confines an animal in a cruel manner;

(6) without the owner's effective consent, causes bodily injury to an animal;

(7) causes one animal to fight with another animal, if either animal is not a dog;

(8) uses a live animal as a lure in dog race training or in dog coursing on a racetrack; or

(9) seriously overworks an animal.

TEX. PENAL CODE ANN. § 42.092(b) (1–9) (Vernon 2011). Failing unreasonably to provide food, water, care, or shelter to an animal in one's custody and abandoning unreasonably an animal in one's custody are Class A misdemeanors unless the defendant has prior convictions for animal cruelty. *See id.* § 42.092(c). Torturing an animal and killing or causing serious bodily injury to an animal in a cruel manner are state jail felonies. *Id.* The statute now defines "torture" as "any act that causes unjustifiable pain or suffering" and "cruel manner" as "a manner that causes or permits unjustified or unwarranted pain or suffering." *See id.* § 42.092(a)(3), (8).

12

The indictment in this case provided that appellant "did then and there intentionally, knowingly, or recklessly cause serious bodily injury and/or kill, in a cruel manner, an animal, to-wit: [cats # 1, 2, 3, and 7] by failing to provide food and/or water and/or care . . . ." The indictment in this case, unlike the indictment in *Kingsbury*, does not simply allege a misdemeanor cruelty charge "under the guise of a felony." It is true that the State had to prove that appellant failed to provide food, water, or care to the cats, as prohibited by subsection (b)(3) of the animal cruelty statute, but it also had to prove death or serious bodily injury to the cat that was committed in a cruel manner, i.e., by causing unjustified or unwarranted pain or suffering. In other words, the failure to provide food, water, or care is the manner and means by which appellant killed the cats, causing them unjustified pain or suffering. It is the killing in a cruel manner that elevates the simple failure to provide food, water, or care from a misdemeanor to a state jail felony in much the same way that a victim's death elevates an assault to a murder. Unlike *Kingsbury*, the current statute required the state to assume a higher burden than merely proving the elements of the misdemeanor offense of failing to provide food, water, or care in order to prove the felony offense alleged. As such, the charged offense was not merely a misdemeanor cruelty charge "under the guise of a felony."

13

The indictment in this case tracked the language of section 42.092(b)(1), which is a state jail felony. An indictment that tracks the statutory language proscribing certain conduct is sufficient to charge a criminal offense. *State v. Edmond*, 933 S.W.2d 120, 127 (Tex. Crim. App. 1996). Because the criminal offenses charged here were state jail felonies, not simply misdemeanors, the trial court had jurisdiction over the case.

Accordingly, we overrule issue two.

## *Sufficiency*

In her first issue on appeal, appellant contends the evidence is legally insufficient. Specifically, appellant challenges whether there is sufficient evidence of the culpable mental state of recklessness. We review the legal sufficiency of the evidence by considering all of the evidence "in the light most favorable to the prosecution" to determine whether any "rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams v. State*, 235

14

S.W.3d 742, 750 (Tex. Crim. App. 2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offenses of which she is accused. *Id.*

A person commits the offense of animal cruelty, as pleaded and submitted to the jury in this case, if she recklessly and in a cruel manner kills or causes serious bodily injury to an animal. TEX. PENAL CODE ANN. § 42.092(b)(2). In a "cruel manner" includes a manner that causes or permits unjustified or unwarranted pain or suffering. *Id.* § 42.092(a)(3).

A person's culpable mental state may be inferred from her acts, words, and conduct, and the surrounding circumstances. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998) ("Mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs."). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *see Laster v. State,* 275 S.W.3d 512, 524 (Tex. Crim. App. 2009) ("[O]ne's acts are generally reliable circumstantial evidence of one's intent."). The culpable mental state of "reckless" is satisfied by evidence indicating that the defendant consciously disregarded a substantial and unjustifiable risk that the proscribed harm would occur—a risk that if disregarded constitutes a gross deviation from the

15

standard of care an ordinary person would exercise under the same circumstances. *Davis v. State,* 955 S.W.2d 340, 348–49 (Tex. App.—Fort Worth 1997, pet. ref'd); *see* TEX. PENAL CODE ANN. § 6.03(c) (Vernon 2011) ("A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct . . . when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.") Reckless conduct "involves conscious risk creation, that is, [that] the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk." *Davis*, 955 S.W.2d at 349 (quoting *Aliff v. State,* 627 S.W.2d 166, 171 (Tex. Crim. App. 1982)).

Appellant first argues that "[t]he jury charge and the indictment did not accurately set out the law[,]" and that  under a hypothetically correct charge she would have been charged with misdemeanor failure to provide the cats with necessary food, water, or care under section 42.092(b)(3).  She further argues that there is insufficient evidence that she failed to provide food or water or that she had custody of the cats as required by the misdemeanor offense.  However, we have already held that appellant was properly charged under the felony section 42.092(b)(1), not the misdemeanor section 42.092(b)(3).  Thus, her argument that the evidence is legally insufficient to prove the elements of the misdemeanor is irrelevant.

16

Appellant next argues that "[t]he evidence was insufficient even though the indictments and jury charges were defective[]" because "[t]he mental state of recklessness was not proven." Appellant argues that Kimberly Paskert's testimony proved that appellant "had no knowledge of the conditions at Whiskerville and that she lied to the Appellant about the status of the cats whose care she was responsible for[,]" and that appellant could not have anticipated Paskert's failure to show up for work.

The State responds that its "sole theory at trial was that Appellant was reckless in relying on only one person to care for 200 cats." In other words, the State is contending that appellant's operation of the shelter with only one employee, who had no assistance or back-up, and who had expressed her need for help on more than one occasion, created the risk of the animals' deaths in a cruel manner, which appellant consciously disregarded.

Here, there was evidence that Paskert, the sole employee at Whiskerville, was overwhelmed by her workload. Paskert testified that it took 10 to 15 hours per day to complete all of the tasks assigned to her, which she tried to accomplish at least two to three days per week. On the other days she worked six to eight hours per day; she never worked less than three hours.

From January 2011 until December 26, 2011, Paskert worked seven days per week, even after she asked appellant to hire someone else to work on the two days

17

that Paskert also cleaned houses for other people. Paskert tried her best to keep up with the tasks, but was not able to do so. Appellant's daughter, who had worked at Whiskerville in the past, described the work as "back breaking."

Appellant knew that Paskert needed help, but would always respond when questioned about it that she "was working on it." A few months before the cats were seized, Donna Jones, a former Whiskerville employee, came by the shelter to pick up cat food. Jones found Paskert there, upset and crying. Paskert told Jones that she was tired, her hands were hurting from all the cleaning, and she needed help. Appellant was aware that Paskert, who was 48 years old, had suffered from arthritis for many years.

Appellant, who lived approximately 20 minutes away from Whiskerville, rarely went to the sanctuary. Appellant usually showed up only for adoption days, and Paskert had not seen appellant at the sanctuary since early October 2011. Indeed, a neighbor, Donna Myers, testified that she had seen no one at Whiskerville during the entire month of December 2011.

Kim Schoolcraft, the manager at the Animal Resource Center in Galveston, testified that she had 10 to 12 employees to take care of the 275 animals that she averaged at her facility. In Schoolcraft's opinion it was "absolutely" unreasonable to expect one person to care for 200 cats.

Although appellant claims that she reasonably relied on Paskert to show up and care for the cats and that Paskert had been a reliable employee for six years before suddenly failing to appear for work, there was evidence that Paskert had quit or was fired once before because she was unable to keep up with the work to appellant's satisfaction.

Based on the evidence that appellant (1) expected Paskert alone to care for 200 cats seven days per week, (2) provided no assistance or back-up for the arthritic Paskert, even though she knew Paskert needed and had requested assistance, (3) rarely went to the shelter herself and had not been seen at Whiskerville in months, and (4) was difficult to reach, other than by text message, and that (5) Paskert had quit or been fired once before when she could not keep up with the work, the jury could have believed beyond a reasonable doubt that appellant created the risk that the animals would not be properly cared for, causing them to be killed or suffer severe bodily injury in a cruel manner, and that appellant consciously disregarded the substantial and unjustifiable risk that the cats' deaths would occur.

Accordingly, we overrule issue one.

### Strict Liability

In issue three, appellant contends the trial court erred "by overruling the appellant's motion to dismiss the indictments where the state created strict liability

19

offenses." Specifically, appellant argues that "the State alleged the misdemeanor elements of animal cruelty without alleging the defensive elements of custody and reasonableness." Appellant's issue is premised on the assumption that the indictment charged appellant with the misdemeanor offense of failing "*unreasonably* to provide necessary food, water, care, or shelter for an animal in the person's *custody*[]" under section 42.092 (b)(3). However, as we have already held, the indictment charged appellant with committing an offense under section 42.092(b)(1), which does not contain what appellant refers to as "the defensive elements of custody and reasonableness."

Accordingly, we overrule issue three.

### *In Pari Materia*

In issue four, appellant contends the trial court erred "by overruling [her] motion to quash the indictments based upon the doctrine of *in pari materia*[.]" Appellant contends that she should have been charged with the misdemeanor offense of "abandoning" an animal under subsection (b)(4), rather than the state jail felony of killing or causing serious bodily injury to an animal in a cruel manner under subsection (b)(1). Specifically, appellant argues that the abandoning portion of the statute more specifically covers the conduct she is alleged to have committed, thus she should have been charged with that offense.

20

When two statutes address the same general subject, they are considered as being *in pari materia. See State v. Vasilas,* 253 S.W.3d 268, 271 (Tex. Crim. App. 2008). All acts and parts of acts *in pari materia* must be read and construed together as though they were parts of one and the same law, even if they were enacted at different times. *Id.* Whenever possible, we must harmonize any conflict between the two statutes so that each is given effect. *Id.* at 272. If the statutes are irreconcilable, then we must apply the more "special" statute as an exception to the general one. *See* TEX. GOV'T CODE ANN. § 311.026 (Vernon 2013). In the context of penal provisions, the Court of Criminal Appeals has determined statutes to be *in pari materia* "where one provision has broadly defined an offense, and a second has more narrowly hewn another offense, complete within itself, to proscribe conduct that would otherwise meet every element of, and hence be punishable under, the broader provision." *Jones v. State*, 396 S.W.3d 558, 561 (Tex. Crim. App. 2013) (quoting *Azeez v. State*, 248 S.W.3d 182, 192 (Tex. Crim. App. 2008)).

A list of four non-exclusive factors may be considered in determining whether the statutes are in *pari materia,* namely, whether the statutes: (1) involve different penalties; (2) are contained in the same legislative act; (3) require the same elements of proof; and (4) were intended to achieve the same purpose or objective. *Burke v. State,* 28 S.W.3d 545, 547 (Tex. Crim. App. 2000).

21

Here, the statutes involve different penalties.  Subsection (b)(1) is a state jail felony and subsection (b)(4) is a Class A misdemeanor.  *See* TEX. PENAL CODE ANN. § 42.092(c).  While both subsections were promulgated in the same 2007 legislative act, they do not require the same elements of proof.  As we discussed in issue two, the felony offense in subsection (b)(1) requires killing or causing serious bodily injury to the animal in a cruel way, i.e., causing unwarranted pain and suffering.  The misdemeanor offense of abandoning does not require death, serious bodily injury, or the causing of unwarranted pain and suffering. And, while both statutes are intended to prevent animal cruelty, the "nature of the forbidden conduct" in the misdemeanor subsection (b)(4) is abandoning an animal, while the forbidden conduct in the state jail felony subsection (b)(1) is killing or causing serious bodily injury in a way that causes unwarranted pain and suffering.  *See Mills v, State*, 722 S.W.2d 411, 415 (Tex. Crim. App. 1986) (determining statute's purpose and objective by considering conduct forbidden by statute).

As such, we conclude that abandonment is not a "more narrowly hewn . . . offense, complete within itself, [that] proscribe[s] conduct that . . . otherwise meet[s] every element of, and hence [is] punishable under" subsection (b)(1).  *Id.* at 414.  Put simply, proof of abandonment alone will not prove the elements of the crime charged.

We overrule appellant's fourth issue.

22

# DEFENSIVE ISSUES

## *Denial of Defensive Charges*

In her fifth issue on appeal, appellant contends the trial court erred "by failing to give appellant's requested charges on custody, assumption of custody, and reasonableness."

The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case [and] not expressing any opinion as to the weight of the evidence . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007). The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications when they are raised by the evidence. *Walters v. State,* 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007). The defendant is entitled to an instruction on every defensive issue raised by the evidence, "regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony is not worthy of belief." *Id.* at 209. The Court of Criminal Appeals has held, however, "that if the defensive theory is not explicitly listed in the penal code—if it merely negates an element of the State's case, rather than independently justifying or excusing the conduct—the trial judge should not instruct the jury on it." *Id.; see also Giesberg v. State,* 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) ("[B]ecause the authority to establish what constitutes a defense rests solely with the Legislature, this Court

concludes [that] a defense which is not recognized by the Legislature as either a defense or as an affirmative defense does not warrant a separate instruction.").

Here, the animal cruelty statute contains affirmative defenses to killing or injuring someone else's dog without their consent if (1) the animal is discovered on one's property and is injuring or killing livestock or damaging crops, or (2) the person killed the animal within the scope of the actor's employment as a public servant or in furtherance of certain electrical or natural gas delivery activities. *See* TEX. PENAL CODE ANN. § 42.092(e). Neither statutory defense is applicable here. The statute also provides an exception to its application if the actor is involved in "generally accepted and otherwise lawful" conduct relating to fishing, hunting, or trapping, wildlife management and related activities, or animal husbandry or agriculture practices involving livestock. *See Id.* § 42.092(f). The jury was charged on these provisions. No other defenses are listed in the statute.

At the jury charge conference, appellant requested, and was denied, the following charges relating to her defensive issue of "assumption of custody":

> "Custody" includes responsibility for the health, safety, and welfare of an animal subject to the person's care and control, regardless of ownership of the animal.

> A person may transfer custody by making reasonable arrangements for the assumption of custody by another person.

24

The first paragraph of the requested charge is taken from the definitions in the animal cruelty statute. *See id.* § 42.092(a)(4). The second paragraph is included in the definition of "abandon." *See id.* § 42.092(a)(1).

The misdemeanor subsection (b)(3) provides that a person commits an offense by failing "unreasonably to provide necessary food, water, care, or shelter for an animal in the person's custody." Custody, as defined in the statute, is an element of the misdemeanor subsection (b)(3), and, as such, even if appellant were charged under subsection (b)(3), which she was not, the second paragraph of the requested charge would be an improper comment on the weight of the evidence. *See Giesberg*, 984 S.W.2d at 248.

Because appellant was not charged under subsection (b)(3), but under subsection (b)(1), which does not mention custody, the statutory definition of custody in the first paragraph of the requested charge was not required. "The better charging practice is to limit the definitional paragraphs [as was done here] to the portions of the statute applicable to the allegations in the indictment." *Lewis v. State*, 676 S.W.2d 136, 143 (Tex. Crim. App. 1984).

Appellant's strategy at trial was to assert that Kimberly Paskert, not she, killed the animals. This attempt at shifting culpability to a third party is essentially an alibi defense. *See McGregor v. State*, 394 S.W.3d 90, 123–24 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (by requesting third-party-culpability issues

25

defendant "is essentially raising the defense of alibi"). Charges on defensive issues raising alibi are not proper because they are an improper comment on the weight of the evidence. *Giesberg*, 984 S.W.2d at 248–50; *McGregor*, 394 S.W.3d at 124. As such, the trial court properly denied appellant's requested defensive issues relating to custody.

We overrule issue five.

### *Due Process*

In her sixth issue on appeal, appellant contends that she was "deprived of due process and due course of law by the State's conduct in this case." The Due Process Clause of the Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law[.]" *See* U.S. CONST. amend. XIV, § 1. Similarly, the Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities . . . except by the due course of the law of the land." TEX. CONST. art. I, § 19. "The touchstone of due process is fundamental fairness." *Euler v. State*, 218 S.W.3d 88, 91 (Tex. Crim. App. 2007).

Appellant argues that the State's conduct in the case was fundamentally unfair because "[t]he State cobbled together an indictment that charged a felony based upon misdemeanor conduct, and then attempted to add the misdemeanor

26

back when they requested the lesser charge so as to prevent the jury from considering the defenses claimed in the misdemeanor statute."

Again, appellant's issue is based on the assumption that the case was wrongly charged as a felony and that her defensive issues were erroneously excluded. We have already held to the contrary on both issues. Further, we note that even if the State's attempts to include lesser-included offenses at the last minute were somehow unfair, the trial court, at appellant's request, did not include any lesser-included offenses in the jury charge.

Accordingly, we overrule issue six.

## SEQUESTRATION ISSUES

Due to the publicity in Galveston surrounding this case, appellant moved to sequester the jury pursuant to TEX. CODE CRIM. PROC. ANN. art. 35.23 (Vernon 2006). The trial court granted the motion. Accordingly, the bailiff accompanied the jury to a local hotel room at approximately 11 p.m. on December 19, 2012. Approximately four hours later, around 2 a.m., a bomb threat was phoned in to the hotel, and the hotel was evacuated. The bailiffs took the jurors outside to their van. While leaving the hotel, the jurors overheard other people at the hotel discussing the bomb threat; no one spoke to the jurors directly.

The bailiffs took the jurors to another hotel, but did not check them in because the hotel was unable to accommodate all of the jurors on the same floor.

27

Some of the jurors told the bailiffs that they would feel safer at the courthouse, so the bailiffs returned the jury to the courthouse at 3:15 a.m. The jury was kept together in the deliberation room, where they were permitted to sleep on the floor. At 7:30 a.m., the bailiffs took the jurors back to their original hotel to collect their belongings and then took them to breakfast. The jurors then returned to the courthouse to resume their deliberations.

After one of the bailiffs testified to these events, appellant moved for a mistrial, which the State did not oppose. The trial court denied the motion, the jury resumed its deliberations, and appellant was ultimately convicted.

### Denial of Mistrial and Motion for New Trial

In her seventh issue on appeal, appellant contends the trial court "erred by failing to grant an agreed mistrial after previously sequestered jurors were not provided overnight facilities and were allowed to separate in violation of TEX. CODE CRIM. PROC. ANN. art. 35.23."[1] In her eighth issue on appeal, appellant

---

[1] TEX. CODE CRIM. PROC. ANN. art. 35.23 provides as follows:

The court may adjourn veniremen to any day of the term. When jurors have been sworn in a felony case, the court may, at its discretion, permit the jurors to separate until the court has given its charge to the jury. *The court on its own motion may and on the motion of either party shall, after having given its charge to the jury, order that the jury not be allowed to separate, after which the jury shall be kept together, and not permitted to separate except to the extent of housing female jurors separate and apart from male jurors, until a verdict has been rendered or the jury finally discharged*. Any person who makes known to the jury which party made the motion not to allow separation of the jury shall be punished for contempt of court. *If such jurors are kept overnight, facilities shall*

28

contends the trial court erred in denying her motion for new trial urging the same grounds. In both motions, appellant argued that the jury was allowed to separate during the hotel evacuation and that "[i]t was during this separation that the jurors learned that a bomb threat had been made against their hotel room—and by extension to themselves." Appellant also argued that the jury deliberation room, in which the jury finally slept, "fails to qualify as 'separate facilities' under Article 35.23."

A mistrial is appropriate only in extreme circumstances for a narrow class of highly prejudicial and incurable errors. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004); *Juarez v. State*, 409 S.W.3d 156, 166 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). Whether a mistrial is required depends on the particular facts of the case. *Ocon*, 284 S.W.3d at 884.

Similarly, we review a trial court's rulings on a motion for new trial for an abuse of discretion. *See Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). In conducting our review, we may not substitute our judgment for that of

---

*be provided for female jurors separate and apart from the facilities provided for male jurors.* In misdemeanor cases the court may, at its discretion, permit the jurors to separate at any time before the verdict. In any case in which the jury is permitted to separate, the court shall first give the jurors proper instructions with regard to their conduct as jurors when so separated. (Emphasis added).

the trial court. *Id*. Rather, we decide only whether the trial court's decision was arbitrary or unreasonable. *Id.* A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.*

The State contends that, even if we assume a violation of section 35.23 occurred, the error is harmless. We agree. Error, if any, in failing to properly sequester the jury is a statutory violation, not a constitutional violation. *Campbell v. State*, 189 S.W.3d 822, 826 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also Rojas v. State*, 986 S.W.2d 241, 252 (Tex. Crim. App. 1998) (Keller, J., concurring). As such, any non-constitutional error that does not affect appellant's substantial rights must be disregarded. *Id.*; TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect on its verdict. *See Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011).

Appellant argues that the "harm is obvious" because "[t]he jurors would undoubtedly have (wrongly) attributed the bomb threat to the Appellant" and "rendered their verdict in an environment of hostility, fear, and exhaustion[,]"

30

which "undoubtedly led the jury to reaching a verdict of guilt that would not have been rendered under normal circumstances."

Nothing in the record, however, supports appellant's assertions. The record shows that the jury was kept together at all times during the evacuation. And, while they were generally aware of a bomb threat at the hotel from overhearing others in the area, no information was given to the jury directly by third parties, and nothing supports the conclusion that the jury attributed the bomb threat to appellant. Indeed, the bailiff, Sergeant Elizondo, who was with the jury on the night in question, testified that the jurors were doing "surprisingly" well and were not in "any particular distress" over the bomb threat. He added that he had not noticed any desire by the jury to discontinue their deliberations. As such, we conclude that appellant's substantial rights were not affected by returning the jury to the deliberation room a few hours early in light of the situation presented at their hotel.

We overrule issues seven and eight.

## CONCLUSION

We affirm the trial court's judgments.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Publish.   TEX. R. APP. P. 47.2(b).