**Opinion issued February 3, 2022**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-20-00316-CV**

_____

**THE STATE OF TEXAS FOR THE PROTECTION OF B.H., Appellant**

**V.**

**J.D., Appellee**

_____

**On Appeal from the 433rd District Court**
**Comal County, Texas**
**Trial Court Case No. C2019-1876D**

_____

**MEMORANDUM OPINION**

The State of Texas appeals the trial court's denial of its application for a protective order in favor of B.H. and against appellee, J.D., under former Chapter 7A of the Code of Criminal Procedure. In two issues, the State contends that the

evidence is insufficient to support the trial court's denial of the protective order and many of its findings of fact and conclusions of law. Alternatively, the State contends that this Court should abate the appeal and remand to the trial court to issue additional findings of fact and conclusions of law addressing all dispositive issues. We reverse and remand for a new trial.

## Background

B.H. ("Bethany") and J.D. ("Jared") were casual acquaintances and classmates at a high school in Comal County.[1] They were not in a dating relationship. In September 2019, they attended a party at a friend's house. Most of the facts are not disputed. The friend, H.C. ("Heather"), invited Bethany, Jared, and three other classmates to her father's house, where they consumed alcohol. No one else, including Heather's father, was at Heather's house.

During the party, Heather became intoxicated and had to be assisted to her bed upstairs, where she fell asleep. By 2 a.m., everyone had left the party except Bethany, Jared, and Heather. Heather was sleeping. Jared and Bethany drank a bottle of wine together for half an hour before they went upstairs to go to sleep. Heather had invited Jared to sleep in the bed with her and Bethany. Jared lay down in the

---

[1]     The Texas Supreme Court transferred this appeal from the Court of Appeals for the Third District of Texas to this Court pursuant to its docket-equalization powers. *See* TEX. GOV'T CODE § 73.001. We use pseudonyms in this opinion to protect the identities of the parties and others who may have been minor children at the time.

middle of the bed with Heather and Bethany on either side of him. Jared initiated sexual activity with Bethany, including sexual intercourse.

According to Bethany's testimony at the hearing on the protective order, she was lying with her back towards Jared when he began touching her. She "immediately just got scared" and froze. She "felt like it had gone pretty far," and she did not want to fight back in fear that Jared might try to hurt her or Heather.

Bethany did not have a car at the house to leave. She tried to stay still and pretended to be asleep, "hoping that he would stop." Jared continued, and he put his fingers inside of her vagina while her back was still to him. Then, he took off her clothes, rolled her onto her back, and had sexual intercourse with her. He "would pick up [her] body and move it," switching between multiple positions and oral sex and sexual intercourse. While having sexual intercourse with Bethany, Jared told her, "Please don't be mad, [Bethany]. I want you so bad. I want to come in you."

Using her left hand that was underneath the blanket, Bethany tried to awaken Heather by poking, scratching, and pinching her. Heather's back was towards Bethany, and she kept brushing Bethany's hand out of the way without waking up. At some point during the encounter, Bethany saw a light through her closed eyes, which she believed was a flash from Jared's cell phone as he photographed or videotaped the incident. She said that the sexual activity lasted "[a]n hour, maybe

3

two." Bethany repeatedly testified that she did not say or do anything to consent to the sexual activity. Instead, she pretended that she was asleep.

Afterwards, Jared put Bethany's clothes back on her and rolled her back over onto her side. Bethany decided that she would "try and get out of [there], call someone, get help to help [Heather] and [herself]." She pretended to fall out of bed and wake up, and she grabbed her cell phone and went into the bathroom. She then went downstairs into another bathroom, locked herself in, and called several friends and a coworker. She told her coworker, one of the only people who answered, that she "was raped." Her coworker told her to awaken Heather so the coworker could pick up the two girls from Heather's house. Bethany grabbed a clothes hanger to use as a weapon, if necessary, and went back into Heather's room.

Bethany woke Heather and told her a concocted story about an emergency involving Bethany's brother. This allowed Bethany and Heather to get away from Jared so Bethany could tell Heather what had happened. Bethany and Heather then left the house.

Later that morning, Bethany contacted the police and reported the incident. Comal County Sheriff's Deputy Eric Guerrettaz investigated Bethany's allegations. As part of his investigation, he interviewed Bethany, Heather, and Jared. Bethany then met with a victim's advocate at her house and went to a hospital in San Marcos for a sexual assault nurse's examination ("SANE" or "SANE examination"). Crystal

4

Schwerdtfeger, a sexual assault nurse examiner, examined Bethany and created a SANE report. The report reflected that Bethany complained that she had been sexually assaulted earlier that morning by oral sex and sexual intercourse, causing her pain. The report also included a lengthy statement from Bethany, which was largely consistent with her testimony at the hearing.

Bethany reported that she "froze" when Jared began touching her. She also reported that, while Jared was having sexual intercourse with her, her face was in the pillow and she had trouble breathing. When Jared tried to lift her body to put her on top of him, she "made [her] body limp." She described various positions in which Jared had sexual intercourse with her, including by putting her legs over her head and with force. The report also stated that Schwerdtfeger's examination of Bethany was consistent with Bethany's statement of the incident.

Within one week of the incident, the State filed an application for a protective order on Bethany's behalf against Jared under Chapter 7A of the Code of Criminal Procedure. The application stated that there was reason to believe Bethany was a victim of sexual assault. The application requested temporary and permanent protective orders prohibiting Jared from communicating with or directing conduct towards Bethany, and prohibiting him from going near her residence, school, and other specified locations. The trial court granted a temporary ex parte protective order, which was extended several times.

5

The hearing on the State's application for the protective order was held over four non-consecutive days from November 2019 to February 2020. Bethany, Guerrettaz, and Schwerdtfeger testified on the State's behalf at the hearing. Bethany repeatedly and consistently testified that she did not consent to Jared's sexual advances. Rather, she pretended to be asleep the entire time. She also described the sexual activity, stating that Jared moved her into multiple positions during the nearly two-hour incident.

Nurse Schwerdtfeger testified about the purpose of a SANE examination, which is to provide and document medical examinations after someone is sexually assaulted. The examination also tests for sexually transmitted infections, administers any necessary medications, and provides any necessary physician referrals. Schwerdtfeger testified that she obtained Bethany's version of the incident, which was included in the SANE report, and she read this verbatim from the report. Schwerdtfeger testified that she found trauma to Bethany's vagina during the examination, but she conceded that trauma can also be caused by consensual sexual intercourse. The trial court admitted the SANE report into evidence.

Deputy Guerrettaz testified about Bethany's report to law enforcement a few hours after the incident occurred. Guerrettaz testified about what Bethany had reported, which was consistent with her testimony and statement in the SANE report. He also testified that Bethany reported she had tried to awaken Heather "by

6

squeezing her arm." Guerrettaz interviewed Heather and testified that she recalled waking up to someone squeezing her arm and seeing Jared on top of Bethany, but Heather could not comprehend what she was seeing at the time.

Guerrettaz also interviewed Jared. Although Jared did not testify at the hearing, the interview was audio recorded. Guerrettaz testified about the interview, and the audio recording was admitted into evidence and played at the hearing.[2]

According to the audio recording, Jared stated that he was intoxicated the night of the incident and his memory of it was fuzzy. He initially denied having sex with Bethany. He said that they were lying in bed falling asleep when he began touching her "inappropriately" before realizing that she was not responding, so he stopped. Then he said that he began kissing Bethany's neck and touching her vagina, but he realized that she was not responding, so he stopped. Then he put his finger inside of her for a few seconds and she did not respond. He stated that usually a girl will respond under the circumstances. He also said Bethany looked like she was asleep.

After Guerrettaz told Jared that Bethany had undergone a SANE examination, Jared admitted that he put his penis inside of her. He denied taking any photographs or video recordings of the incident several times before finally admitting that he had

---

[2] The record on appeal includes the audio recording of Jared's statement to Guerrettaz, but it does not include a transcript of this statement.

7

videotaped the sexual activity with Bethany. He said that, when he saw her in the flash of his cell phone while recording the video, he noticed that she was not awake and stopped instantly. He also admitted that he deleted the video because Bethany was not awake.

Guerrettaz obtained a search warrant for Jared's phone, but he was unable to recover the deleted video. He also obtained Jared's DNA through a search warrant, and preliminary test results indicated that Jared's DNA was found inside Bethany's vagina during the SANE examination. Guerrettaz obtained an arrest warrant for Jared and charged him with sexual assault, but Jared had not been indicted by the time of the protective order hearings. Guerrettaz testified that he believed Jared committed a sexual assault against Bethany and a protective order was necessary and in her best interest.

On cross-examination, Guerrettaz testified that Jared "gave several different versions of what occurred that night," while Bethany's statement was "much more detailed" and described "a much more elaborate encounter with [Jared] in how he would position her into multiple different positions . . . ."

In its closing argument, the State requested that the trial court grant a lifetime protective order based on reasonable grounds to believe that Bethany was a victim of Jared's sexual assault. During Jared's closing statement, his counsel argued that "[Bethany] was conscious for the majority of the two hours that this is going on"

8

and that "essentially [Jared] stopped, according to his statement, once he was concerned." At the end of the hearing, the trial court orally denied the State's application for a protective order. The court later issued a written order denying the application.

At the State's request, the trial court issued the following findings of fact and conclusions of law:

**FINDINGS OF FACT:**

1. The Court finds that it has subject matter jurisdiction, as well as jurisdiction over both parties, [Bethany] and [Jared], involving the State's Application for Protective Order pursuant to Article 7A of the Texas Code of Criminal Procedure. The Court finds that [Jared] did not engage in acts of sexual assault, stalking, or trafficking and poses no threat in the foreseeable future to [Bethany].

2. Following an evening of partying, including consumption of alcohol and/or use of marijuana, the parties agreed to go to bed together in the bedroom of [Heather], a mutual friend who had been partying with them and was in fact asleep in the same bed. During the course of the evening and over a period of up to two hours, the two parties engaged in mutual, consensual sexual activity. During the course of this consensual sex, which included oral sex and sexual intercourse in multiple positions for up to two hours, [Bethany] at all times pretended to be asleep. At some point during the sexual encounter, [Jared] began to videotape the activity on his cell phone. [Bethany] did not consent to the photography and became angry.

   [Bethany] then pretended to fall out of the bed, slowly picked herself up off the floor, and went to the bathroom where she pretended to throw up and subsequently went downstairs to another room. Notably [Jared] did not interfere with her egress from the room in any way. [Jared] claims and the Court finds that

9

when he saw her in the light produced by the cell phone camera, he concluded she was passed out and ceased all further sexual activity. Prior to seeing her in the light produced by the cell phone, [Jared] believed that [Bethany] was conscious and the sexual activity was consensual. [Jared] even spoke to [Bethany], believing she was conscious and listening to him. The Court finds that all sexual activity between the parties was consensual. One can only speculate as to why [Bethany] pretended to be asleep when she was not. Perhaps she intended to subsequently claim that she was unconscious throughout the activity, though she clearly testified she was conscious and the Court finds that she was conscious. [Jared] claims to have deleted the video and the police search warrant return seems to confirm that claim.

**CONCLUSIONS OF LAW:**

The Court concludes that [Bethany] is not a credible witness and that she voluntarily engaged in all sexual activity with [Jared]. Thus, the State's Application for Protective Order is in all things denied. The Court finds that [Bethany] was 18 years of age and [Jared] was 17 years of age at the time of these events.

After the trial court issued these findings and conclusions, the State requested additional specified findings and conclusions, arguing that the trial court's initial findings and conclusions did "not address all the essential and potentially dispositive issues specified by the State." The record does not reflect that the trial court filed any additional findings or conclusions. The State also filed a motion for reconsideration, but the record does not reflect that the trial court ruled on it. This appeal followed.

10

**Sufficiency of Evidence**

In its first issue, the State argues that the evidence is legally and factually insufficient to support the trial court's order denying the application for a protective order and its findings of fact and conclusions of law.

## A. Standard of Review

Appellate courts review a trial court's ruling on a protective order under Chapter 7A of the Code of Criminal Procedure for legal and factual sufficiency of the evidence. *State ex rel. P.B. v. V.T.*, 575 S.W.3d 921, 924 (Tex. App.—Austin 2019, no pet.); *Webb v. Schlagal*, 530 S.W.3d 793, 802 (Tex. App.—Eastland 2017, pet. denied); *Shoemaker v. State ex rel. C.L.*, 493 S.W.3d 710, 714–15 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

When, as here, the trial court files findings of facts and conclusions of law, we review the factual findings for sufficiency of the evidence, but we review legal conclusions de novo. *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020). "The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). When a reporter's record is made part of the record on appeal, findings of fact are not conclusive on appeal but are binding only if they are supported by the evidence. *Id.* at 795.

"When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *P.B.*, 575 S.W.3d at 924–25 (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam)). We view the evidence in the light most favorable to the finding of fact, indulging every reasonable inference that would support the finding and disregarding contrary evidence unless a reasonable factfinder could not. *Bos v. Smith*, 556 S.W.3d 293, 300 (Tex. 2018); *Shoemaker*, 493 S.W.3d at 715.

In a legal sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded factfinder to reach the verdict under review. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). Evidence is legally insufficient to support a finding when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.*

More than a mere scintilla of evidence exists in the record "when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* Conversely, the record contains less than a scintilla when the evidence offered to prove a vital fact's existence is "so weak as to do no more than

12

create a mere surmise or suspicion." *Id.* (quoting *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)).

"When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *P.B.*, 575 S.W.3d at 925 (quoting *Dow Chem.*, 46 S.W.3d at 242); *see Shoemaker*, 493 S.W.3d at 715.

In determining whether the evidence is factually insufficient to support a finding, an appellate court will set aside the finding "only if, after considering and weighing all of the evidence in the record pertinent to that finding, it determines that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the [finding] should be set aside and a new trial ordered." *P.B.*, 575 S.W.3d at 925 (quoting *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016)); *see Benavente v. Granger*, 312 S.W.3d 745, 748 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

## B. Governing Law

At the time of the trial proceedings, Chapter 7A of the Code of Criminal Procedure authorized the State to obtain temporary and permanent protective orders on behalf of a victim of certain crimes—including sexual assault—against the offender who committed those crimes. TEX. CODE CRIM. PROC. art. 7A.01(a)(1), (a-

1).[3] If, after a hearing, the trial court finds that "there are reasonable grounds to believe that the applicant is the victim of sexual assault or abuse, indecent assault, stalking, or trafficking," then the court "shall issue" a protective order. *Id.* art. 7A.03(a), (b). The protective order may last up to the duration of the lives of the offender and of the victim. *Id.* art. 7A.07(a).

As relevant here, a person commits the offense of sexual assault if the person intentionally or knowingly, without the other person's consent, "causes the penetration of the anus or sexual organ of another person by any means" or "causes the sexual organ of another person . . . to contact or penetrate the mouth . . . of another person, including the actor[.]" TEX. PENAL CODE § 22.011(a)(1)(A)–(B). Sexual assault is without the consent of the other person if the other person has not consented and the actor knows that the other person is unconscious, physically unable to resist, or unaware that the sexual assault is occurring. *Id.* § 22.011(b)(3), (5).

This definition thus requires an applicant for a protective order to prove both that: (1) the complainant did not consent, that is, she did not "assent in fact, whether

---

[3]     Chapter 7A was repealed effective January 1, 2021, and its provisions were recodified in Chapter 7B of the Code of Criminal Procedure. *See* Act of May 16, 2011, 82nd Leg., R.S., ch. 135, § 2, arts. 7A.01–.07, 2011 Tex. Gen. Laws 640, 640 (repealed 2019); *see also* TEX. CODE CRIM. PROC. art. 7B.001(a)(1) (authorizing issuance of protective order on behalf of victim of sexual assault crime). Citations to Chapter 7A in this opinion refer to the provisions in effect during the trial court proceedings.

express or apparent," *id.* § 1.07(a)(11); and (2) the actor knew that the complainant was unconscious, physically unable to resist, or unaware that a sexual assault was occurring. *Id.* § 22.011(b)(3), (5); *Elliott v. State*, 858 S.W.2d 478, 484 (Tex. Crim. App. 1993) (stating that, to establish nonconsensual sexual activity under subsection (b)(3), evidence must show (1) lack of "consent" as defined in Penal Code section 1.07, that is "assent in fact, whether express or apparent;" and (2) defendant knew complainant was physically unable to resist).

**C.     No evidence supports the findings that Bethany "voluntarily engaged in all sexual activity" with Jared and that "all sexual activity between the parties was consensual."**

The State challenges the sufficiency of the trial court's determination—styled as a conclusion of law—that Bethany "voluntarily engaged in all sexual activity" with Jared and therefore was not entitled to a protective order. The State also challenges the sufficiency of the evidence supporting the trial court's finding of fact that "all sexual activity between the parties was consensual." We agree with the State that no evidence supports the trial court's findings that Bethany consented to and voluntarily engaged in the sexual activity. We sustain the State's issue.

The State sought a protective order on the basis that Jared's sexual conduct constituted "sexual assault." To prevail under Penal Code section 22.011(b)(3) or (b)(5), the State was required to prove that reasonable grounds existed to believe that

15

Bethany "ha[d] not consented" to Jared's sexual conduct.[4] *See* TEX. PENAL CODE §

22.011(b)(3), (5). If that element was proven, then the State also had to prove either

that Jared knew that Bethany was unconscious or physically unable to resist, *id.* §

22.011(b)(3), or that Jared knew that Bethany was unaware that the sexual assault

was occurring, *id.* § 22.011(b)(5).

We focus first on the question whether Bethany consented to the sexual

activity. The Texas Penal Code defines the term consent as "assent in fact, whether

express or apparent." *Id.* § 1.07(a)(11). We agree with the State that there is not a

scintilla of evidence that Bethany gave her "assent in fact, whether express or

apparent," to Jared's sexual contact.

The facts on this point are undisputed. Bethany testified and the trial court

found that she "at all times pretended to be asleep." She never verbally consented,

nor did she reciprocate any of Jared's physical contact. Bethany's testimony on this

point was unequivocal:

> Q.:  So you said your back was to him. Had you said anything to him
>      consenting to sexual activity?
>
> A.:  No.
>
> . . .
>
> Q.:  So at that point did you say anything to him consenting to sexual
>      activity?

---

[4]    The parties do not dispute that Jared intentionally and knowingly caused the sexual
       conduct that meets the criteria in Penal Code section 22.011(a)(1)(A) and (C).

16

A.: No.

. . .

Q.: And while he was doing that, was there any point that you consented to the sexual activity?

A.: No.

. . .

Q.: Did you ever do or say anything to [Jared] that he would have considered consenting to sexual activity?

A.: No.

Q.: Did you ever consent to sexual activity with [Jared]?

A.: No.

. . .

Q.: Was there any point that you told him you wanted to engage in sexual activity?

A.: No.

Jared's statements confirm the same. He admitted or agreed that Bethany "was not responding," "wasn't able to tell [him] that [she] was like okay to keep going forward," "wasn't responding at all," "was like kind of like asleep," "was not lucid," "was not able to tell [him] to stop or to tell [him] that it was okay or not okay," "was not fully functioning," "was not comprehensive . . . conscious," "just wasn't moving or anything," "wasn't fully there," and "wasn't awake." There is no evidence that Bethany ever gave verbal consent or physically reciprocated Jared's advances. On appeal, Jared acknowledges that Bethany "did not provide explicit consent" to the

17

sexual activity. Instead, he devotes his brief to the final element of the sexual assault: whether Jared knew that Bethany was unconscious.

That Bethany "at all times pretended to be asleep" conclusively proves that she did not give express or apparent assent to Jared's sexual conduct. Texas courts have held that if a person is asleep when sexual contact occurs, it can be inferred that the person did not consent to the sexual contact. *Hughes v. State*, 194 S.W.3d 649, 654 (Tex. App.—Tyler 2006, no pet.) (concluding that evidence was sufficient to show lack of consent when, among other things, appellant began sexual abuse while victim was asleep); *Pierce v. State*, No. 05-12-01211-CR, 2013 WL 6196275, at *4–5 (Tex. App.—Dallas Nov. 25, 2013, no pet.) (mem. op., not designated for publication).

Undisputedly, Bethany was behaving just as though she were asleep. Consequently, she did not give consent in fact, whether express or apparent. *See In re D.G.*, No. 03-12-00455-CV, 2014 WL 3732930, at *2 (Tex. App.—Austin July 23, 2014, no pet.) (mem. op., not designated for publication) ("Here, K.C.G.'s testimony demonstrated that appellant removed her clothes while she was asleep and that when she awoke appellant was on top of her already engaging in sexual conduct. Thereafter, she kept her eyes half-closed and laid still, basically pretending to be asleep. One can infer from this evidence, and reasonable inferences from it, that

appellant knew that K.C.G. did not consent to the sexual conduct . . . ."). Being nonresponsive is neither express nor apparent assent in fact.

Furthermore, nothing in Texas law required Bethany to physically or verbally resist Jared in order to avoid a finding that the activity was consensual and voluntary. Texas law no longer conditions a finding of sexual assault on the degree to which a victim physically resists an attacker. *See Elliott*, 858 S.W.2d at 484–85 (discussing long history of concept of resistance in Texas's forcible rape law, ultimately culminating in Legislature dropping requirement of resistance in Penal Code section 22.011).

Nor does Texas law equate feigning sleep to express or apparent assent. In *Jiminez v. State*, we addressed a scenario that bears some similarities to the case at hand: a male penetrated the sexual organ of a female who pretended to be asleep throughout the episode; there was no communication whatsoever between the female and her attacker during the sexual encounter; and the female did not verbally command the attacker to stop. 727 S.W.2d 789, 791–92 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd). The male was a university police officer who happened upon an intoxicated student in an unlit university building. *Id.* at 791. When the student heard his police radio and realized that he was an armed university police officer, she became terrified and "feign[ed] sleep or unconsciousness" throughout the ordeal. *Id.* She testified that she did not verbally resist him because it was not "pleasant" to

do so. *Id.* Once the officer attempted to have intercourse with her, she acted as though she was waking up, and he fled. *Id.* at 791–92.

In reviewing the officer's sexual assault conviction, this Court stated that the student was not required to physically or verbally resist the officer's sexual assault. *Id.* at 792. Rather, we explained that "it is natural and reasonable for one who is involuntarily confronted with distasteful options to select the one that is the least distasteful. . . . A victim is not required to resist, and it may be wise not to do so." *Id.* We ultimately reversed the officer's conviction for sexual assault by use or threat of force because there was no evidence that he intentionally or knowingly used or threatened to use force or violence. *Id.* at 792, 793. But in so holding, we emphasized that the "fatal defect in this case is not the absence of resistance, but the absence of the threat or use of force or violence." *Id.* at 792.

In sum, it is undisputed that Bethany feigned sleep in response to Jared's sexual conduct. Feigning sleep is neither express nor apparent assent. Accordingly, we hold that no evidence supports the trial court's findings that "all sexual activity between the parties was consensual" and that Bethany "voluntarily engaged in all sexual activity" with Jared.

We further hold that the evidence is legally insufficient to support the trial court's finding that "[o]ne can only speculate as to why [Bethany] pretended to be asleep when she was not. Perhaps she intended to subsequently claim that she was

20

unconscious throughout the activity." No evidence supports this finding, which is expressly based on speculation. *See Gunn*, 554 S.W.3d at 658 (stating that evidence is less than scintilla when it is so weak as to do no more than create mere surmise or suspicion). "Findings based on speculation are not based on legally sufficient evidence." *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 114 (Tex. 2009).

**D.    There is factually insufficient evidence that Jared "believed that [Bethany] was conscious and the sexual activity was consensual" until he saw her in the light of the cell phone camera.**

To establish grounds for a protective order, the State was also required to prove that there were reasonable grounds to believe that Jared knew that Bethany was "unconscious or physically unable to resist," TEX. PENAL CODE § 22.011(b)(3), or that Jared knew that Bethany was unaware that the sexual assault was occurring, *id.* § 22.011(b)(5). The trial court denied the restraining order based on the finding that

> when [Jared] saw [Bethany] in the light produced by the cell phone camera, he concluded she was passed out and ceased all further sexual activity. Prior to seeing her in the light produced by the cell phone, [Jared] believed that [Bethany] was conscious and the sexual activity was consensual. [Jared] even spoke to [Bethany], believing she was conscious and listening to him.

As explained below, factually insufficient evidence supports this finding.

21

**1.** **The statute turns on Jared's subjective knowledge of Bethany's consciousness, not on whether Bethany actually was conscious.**

Before turning to the evidence, we note that the State and Jared agree that Penal Code section 22.011(b)(3) and (b)(5) turn on whether Jared *subjectively believed* that Bethany was unconscious, physically unable to resist, or unaware that the sexual assault was occurring. Under the Penal Code, a person acts knowingly, or with knowledge, "when he is aware of the nature of his conduct" or the circumstances surrounding the conduct. TEX. PENAL CODE § 6.03(b). A person also acts knowingly "when he is aware that his conduct is reasonably certain to cause the result." *Id.*

Both parties cite our dicta in *Jiminez* as supplying the proper statutory interpretation of section 22.011(b)(3) and (b)(5) in the context of a sexual assault while a victim was feigning sleep. In *Jiminez,* we reasoned that the word "know"' is "not limited to an actor's awareness of existing facts, but is broader and may include an actor's subjective belief in facts that do not exist or are not true." *Jiminez*, 727 S.W.2d at 792. In other words, if Jared believed that Bethany was unconscious or unaware of the assault, then he "knew" those facts, as required by subsections 22.011(b)(3) and (5), even though the "facts" did not exist. Accordingly, our analysis turns on whether Jared believed that Bethany was unconscious and unaware, not whether she actually was conscious or unaware.

22

**2.** **The great weight of the evidence is against the finding that Jared believed that Bethany was conscious and that the sexual activity was consensual until he saw her in the camera light.**

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co*., 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We find that the evidence is factually insufficient to support the trial court's conclusion that Jared believed that Bethany was conscious and that the sexual activity was consensual until he saw her in the camera light.

The evidence supporting the trial court's finding consists of Jared's testimony that he stopped his sexual contact with Bethany when he realized that she wasn't responding. He told Detective Guerrettaz: "Like I'm promising as soon as I realized that she was not able to tell me to stop or to tell me that it was okay or not okay I stopped right then like I did not keep going." He admitted, "Yes, I did put my penis inside of her and I'm admitting that to you because you're giving me the opportunity to, but like I did not mean for that to happen." After denying having sex with Bethany at all, he acknowledged doing so, but insisted that the encounter lasted "under a

23

minute." And after denying filming her at all, he admitted to doing so. Jared stated that he stopped his sexual contact when he "realized she wasn't awake" as he filmed.

In contrast to Jared's description of an under-a-minute encounter, Bethany testified that Jared engaged in the following conduct while she was pretending to be asleep: kissing her, putting his finger in her vagina, performing oral sex on her, and maneuvering her into multiple positions for intercourse. Consistent with Bethany's testimony, the trial court expressly found that the parties engaged in "oral sex and sexual intercourse in multiple positions for up to two hours."[5] The trial court's finding of a much more involved sexual encounter is strong circumstantial evidence that Jared knew that Bethany was not conscious or consenting. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (stating that part of factfinder's task is to draw "reasonable inferences" from evidence). It is undisputed that Bethany feigned sleep and did not reciprocate throughout the entire encounter. *See Everson v. State*, No. 01-07-00510-CR, 2008 WL 2548843, at *5 (Tex. App.—Houston [1st Dist.] June 26, 2008, pet. ref'd) (mem. op., not designated for publication) (finding that video

---

[5] Despite finding that Bethany "is not a credible witness," the trial court credited Bethany's testimony over Jared's on the point upon which the parties' testimony conflicted. Bethany testified to an encounter that included multiple sexual positions, and Jared denied multiple sexual positions. The trial court made no credibility finding as to Jared. Because we are already remanding for a new trial, we need not determine whether the trial court's findings are in fatal conflict thus necessitating a new trial. *See* TEX. R. APP. P. 47.1.

24

of sexual act indicated unconsciousness and sexual assault where the victim "does not move unless appellant moves her").

Jared's own statement supplies additional proof that he knew that Bethany was unconscious before he began engaging in sexual intercourse with her. In his interview with Detective Guerrettaz, Jared provided a timeline of the events leading up to seeing her in the light from his phone, changing his story each time about what he was doing when he ceased the sexual activity:

> I did not have sex with her with [Bethany]. I, we were sleeping in the same bed as [Heather] and I was *really, really drunk. So was she*. And we were both just lying there I guess falling asleep and then I started to make a move on her. And then when I realized that *she was not responding or anything* I completely stopped. I stopped everything I was doing, but I had begun to touch her inappropriately but I didn't like as soon as I realized that *she wasn't able to tell me that I was like okay to keep going forward* with that I completely stopped. I did not keep going.
>
> . . .
>
> Ok, so, I was just, like we were lying in the bed and I was just like kinda like kissing her like neck and stuff and then I started to touch her with like my hands on her genitals, like her vagina. And then when I realized that *nothing like she wasn't responding at all that's when I stopped. I was like okay that's not okay*. And that's when I stopped.
>
> . . .
>
> *She just was like kind of like asleep*. I mean she didn't seem like she was like dead passed out. It just like was like she was asleep. But literally like I'm telling the truth. When I say when I realized that she was like that I completely stopped and I did not keep going from that point on.
>
> I don't know because I fingered her but for a few seconds and then I— *when she was not responding*. Because I mean when you do that with a

girl they usually respond. And when she didn't respond I kind of freaked out.

. . .

I'm going to be honest. I'm just freaking out because I didn't realize that she was that *she was not lucid*. Like I'm freaking out right now. My heart is racing. Like I'm promising as soon as I realized that she *was not able to tell me to stop or to tell me that it was okay* or not okay I stopped right then like I did not keep going. Yes, I did put my penis inside of her and I'm admitting that to you because you're giving me the opportunity to, but like I did not mean for that to happen.

(Emphasis added).

Jared said that each of the foregoing acts occurred before he began videotaping Bethany, at which point he "saw that she wasn't awake" and ceased his sexual activity. Even taking as true his statement that he had not *seen* that she was not awake prior to this point, Jared's own statements are strong proof that he was aware contextually that she was not conscious and consenting at a much earlier juncture.

Jared argues that a reasonable inference from his having spoken to Bethany during the sexual activity is that he believed she was awake. Indeed, the trial court found that he "even spoke to [Bethany], believing she was conscious and listening to him." Bethany stated that Jared spoke to her during the sexual encounter and no evidence contradicts her testimony. Thus, the trial court's finding that Jared spoke to Bethany is supported by legally and factually sufficient evidence.

However, the words that Jared spoke to Bethany—"Please don't be mad," "I want you so bad," and "I want to come in you"—do not indicate that, by speaking to her, he believed she was awake, conscious, and consenting to the sexual activity. This is particularly so considering that Jared stated these words during sexual intercourse—*after* Bethany did not respond to his initial advances and penetration of her vagina with his finger, which Jared admitted was unusual. Jared also told Guerrettaz that Bethany was asleep, not that he believed she was awake. These words do not indicate that he was attempting to converse with an awake or conscious person. Much the opposite, these words indicate that Jared subjectively believed that Bethany was unconscious or unaware that the sexual activity was occurring.

Jared also argues that he did not "receiv[e] any information that would give him reasonable cause to believe that [Bethany] was unconscious, [was] unable to resist, or was unaware a sexual assault was occurring . . . ." However, as Jared himself stated in his interview, he knew that it was unusual under the circumstances when Bethany did not respond to him penetrating her vagina. Receiving no information from a partner during sexual activity is circumstantial evidence of what the actor knew or believed to be true about the partner's consent to the sexual activity. *See Dixon v. State*, 455 S.W.3d 669, 677 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("A person's culpable mental state may be inferred from her acts, words, and conduct, and the surrounding circumstances.").

Jared relies on two opinions from our sister courts to argue that the trial court's order and its findings and conclusions are supported by sufficient evidence. In *Limonta-Diaz v. State*, an intoxicated woman called a rideshare service at the end of an evening with friends. *See* 593 S.W.3d 447, 450 (Tex. App.—Austin 2020, pet. ref'd). Her memory was "fuzzy," and the next thing she remembered was the rideshare driver being in the backseat on top of her and her feeling pinned down, although she tried pushing the driver off of her. *Id.* She was finally able to leave the car and run to her apartment, which she shared with her brother, and she told him she had been raped. *Id.* She reported the incident to law enforcement, and the driver was arrested, charged, and later convicted of sexual assault. *Id.* at 450–52.

On appeal, the driver argued that the evidence was insufficient to support his conviction because the State failed to prove that the encounter was without the woman's consent under subsections (b)(3) and (b)(5). *Id.* at 458. The court disagreed. The jury was entitled to believe the evidence showing that the woman was intoxicated, including her testimony that her memory of the incident was "fuzzy." *Id.* at 459. Other witnesses also testified that they had observed the woman intoxicated, including her brother who saw her immediately after the incident, which indicated that her intoxication was apparent to others and, thus, would have been apparent to the driver. *Id.*

Jared argues that, unlike the woman with the "fuzzy" memory, Bethany was awake and aware of Jared's actions. But *Limonta-Diaz* does not require a complainant to have a "fuzzy" memory or periods of unconsciousness in order to find that the defendant knew that the sexual activity was without the consent of the other person under subsections (b)(3) and (5). *See id.* at 458–59. Rather, this was circumstantial evidence from which the jury could reasonably conclude that the complainant had memory gaps and, therefore, was unaware due to her level of intoxication. *See id.* at 459. The issue of feigning sleep or consciousness did not arise in *Limonta-Diaz*, and the issue of periods of unconsciousness does not arise in this case.

Nevertheless, *Limonta-Diaz* generally supports our decision. The court found that the sexual intercourse was nonconsensual in part because others perceived the woman as intoxicated, and therefore the driver also could have perceived her intoxication and known that she was unconscious, physically unable to resist, or unaware that the sexual assault was occurring. *Id.* This reasoning focuses on what the driver perceived or subjectively believed about the incident: although the woman had periods of consciousness, the evidence showed that the driver knew that she was highly intoxicated and therefore knew that she was unconscious or unaware of the sexual assault. *See id.*; *accord Jiminez*, 727 S.W.2d at 793 (stating that "know" in sexual assault statute includes "not only what is objectively true, but also what is

held, in an actor's mind, as true or as being what it purports to be, even though it may not be true and may not be what it purports to be"). We also note that, here, it is undisputed that the parties shared a bottle of wine within thirty minutes of going to sleep, which shows that Jared had reason to believe that Bethany, a high school student, may be intoxicated.[6] Indeed, Jared stated that he and Bethany were both "really, really drunk."

Jared also relies on *Bagley v. State*. *See* No. 08-00-00411-CR, 2002 WL 244831 (Tex. App.—El Paso Feb. 21, 2002, pet. ref'd) (mem. op., not designated for publication). In that case, Bagley and a neighbor went on a date to a bar, but the neighbor became disoriented and lost consciousness after leaving the bar but before reaching the car. *Id.* at *1. She later regained her memory of the night and recalled that Bagley had sexually assaulted her. *Id.* At Bagley's trial, the State introduced a video recording in which Bagley admitted to penetrating the neighbor's vagina with his fingers while she was passed out. *Id.* Two law enforcement officers also testified about Bagley's confession. *Id.* Bagley was convicted under the definition of nonconsensual sexual activity in subsections (b)(3) and (b)(5). *Id.* at *2.

---

[6] Jared argues that a classmate told Guerrettaz that Bethany did not seem intoxicated at the party. However, as the State points out, the classmate observed Bethany's demeanor earlier in the night prior to the parties drinking a bottle of wine after everyone else left, a fact that Jared concedes. The classmate's observations are not relevant to Bethany's demeanor at the end of the night after sharing a bottle of wine with Jared.

30

On appeal, Bagley argued that he was entitled to a jury instruction on mistake of fact, specifically whether he mistakenly believed that the sexual conduct was consensual because he believed that "she wanted [him]" based on her words and actions before the assault. *Id.* at *1, 2. However, based on the neighbor's testimony that she was passed out, Bagley's confession on the videotape, and two officers' testimony about the confession, the court concluded that the evidence was sufficient to prove that Bagley knew the neighbor was unconscious at the time of the assault. *Id.* at *3.

Jared argues that *Bagley* is distinguishable because Bethany did not pass out before Jared but the two went to bed at the same time, and there is no evidence of how long the parties had lain in bed before Jared made the sexual advances. These arguments are unavailing. *Bagley* did not rely on the fact that the neighbor passed out before Bagley did to find sufficient evidence of sexual assault, although it was circumstantial evidence of what Bagley knew at the time. *Id.* at *2–3.

Rather, the decision primarily relied on Bagley's own confession that the sexual activity occurred while the neighbor was passed out, as shown to the jury in the video recording and related by two officers. *See id.* As in *Bagley*, Jared's own statement that Bethany was asleep—not that she had not yet fallen asleep—is evidence of his knowledge prior to making the sexual advances, and his timeline of the incident is evidence of his knowledge during the incident. Bethany's testimony

31

that she pretended to be asleep is circumstantial evidence that Jared knew that Bethany was unconscious or unaware of the sexual activity regardless of how long they had lain in bed before the sexual advances. Thus, neither *Limonta-Diaz* nor *Bagley* supports Jared's position.

While Bethany's testimony may be circumstantial evidence of what Jared knew at the time—such as that she pretended to be asleep at all times and did not consent to Jared's sexual advances—Jared's own statements are also evidence of what he subjectively believed was true. *See Jiminez*, 727 S.W.2d at 793. We hold that the trial court's order denying the State's application for a protective order under Chapter 7A of the Code of Criminal Procedure is not supported by factually sufficient evidence.[7] We sustain the State's issue and remand for a new trial. Because we are remanding for a new trial, we need not reach the parties' remaining issues. *See* TEX. R. APP. P. 47.1; *Heritage Hous. Dev., Inc. v. Carr*, 199 S.W.3d 560, 572 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

---

[7] Nothing in this opinion should be construed to opine on whether the record evidence would be sufficient to prove beyond a reasonable doubt that Jared sexually assaulted Bethany as required to convict him of a criminal offense.

32

## Conclusion

We reverse the order of the trial court denying the State's application for a protective order on behalf of B.H., and we remand the case for a new trial consistent with this opinion.


April L. Farris
Justice

Panel consists of Justices Kelly, Hightower, and Farris.

33